603 A.2d 1376

**CONSUMER PROTECTION DIVISION**

v.

**OUTDOOR WORLD CORPORATION.**

**No. 998, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

April 9, 1992.

**276**

J. Joseph Curran, Jr., Atty. Gen. and William D. Gruhn, Asst. Atty. Gen. (Peter V. Berns and Jacqueline W. Mintz, Asst. Attys. Gen., on the brief), Baltimore, for appellant.

Bedell A. Tippins (A. Benjamin Goldgar, Keck, Mahin and Cate, on the brief, Chicago, Ill., Thomas P. Perkins, III, Christopher R. Mellott, Jana C. Burch, Venable, Baetjer and Howard, Robert P. O'Brien and Niles, Barton & Wilmer, on the brief), Baltimore, for appellee.

Argued before WILNER, C.J., and ALPERT and WENNER, JJ.

WILNER, Chief Judge.

The Consumer Protection Division of the Office of the Attorney General, after extensive hearings, concluded that appellee, Outdoor World Corporation (OWC), had engaged in unfair and deceptive trade practices in violation of the State Consumer Protection Act, whereupon the Division entered an Administrative Order providing broad injunctive and restitutionary relief. The Circuit Court for Baltimore City vacated that order in its entirety, however, concluding that the Division had no jurisdiction to control the activities addressed by the order. The Division appeals from that decision.

## I. *Procedural History*

OWC, a Pennsylvania corporation, owns a number of campgrounds along the East Coast, none of which are in Maryland. The company sells memberships in these campgrounds, allowing the purchaser to use a site, subject to certain restrictions and fees. Its marketing strategy is centered around the mass mailing of written material which neither identifies OWC nor mentions anything about campsites. Instead, it states that the recipient has definitely won at least one prize from among several listed in the material and strongly suggests that he or she may also have won or be eligible to win a prize of considerable value. The notice recites no conditions to claiming the prize other

than appearing at a particular location, being in all cases one of OWC's campgrounds.

Using different aliases, OWC mails out some 30 to 40 million of these notices each year. When, in response to them, people arrive to collect their prizes, they are told that, in order to obtain the prize, they must first take a tour of the campground and listen to a sustained and aggressive sales pitch, all of which can take the better part of a day. Although prizes may eventually be given, they are generally of little value and, in many instances, require payment of a "redemption" fee.

The Division asserts, without contradiction, that OWC has been mailing these notices to Maryland residents since 1984, that in the 10–month period from November, 1988 through September, 1989, it mailed nearly six million notices to Maryland residents, that some 43,000 Marylanders visited OWC campgrounds since 1986, and that approximately 5,000 Marylanders purchased campsite memberships. OWC informs us that it has collected or is entitled to collect about $60,000,000 from the sale of these 5,000 memberships.

On May 31, 1989, the Division formally charged OWC with false and misleading solicitations and unfair and deceptive sales tactics. In support of the first charge, the Division alleged that the OWC notices mailed to Maryland residents had the effect of causing the recipients to believe that they had won or were likely to win a valuable prize when in fact there was but a minuscule likelihood that such was the case, that the notices failed to disclose that they were, in reality, solicitations to sell campsites, that by the use of assumed and misleading names the notices also represented that OWC had a sponsorship or affiliation that it did not have, that the notices failed to inform the recipients that they would be required to pay money or take a tour in order to claim the prize, and that the notices failed to disclose on the first page the retail value of the prize and the odds against winning it.

The first charge centered on the solicitations mailed into Maryland; the second charge dealt principally with OWC's conduct at the campsites. In it, the Division complained about the length of the tour and the length and nature of the sales promotion to which prospective customers were subjected, including assertions that, in the course of the promotion, OWC made false statements regarding the nature and availability of its facilities, false assurances concerning the customers' right to rescind contracts, and false representations that the price demanded for a campsite was valid only for that day and would be higher thereafter.

The conduct complained of was alleged by the Division to violate Md.Code, Comm. Law art., §§ 13–303 and 13–305. Section 13–303 prohibits a person from engaging in any "unfair or deceptive trade practice, as defined in this subtitle" in the sale or offer for sale of any consumer realty, consumer goods, or consumer services. The term "unfair or deceptive trade practice" is defined in § 13–301 as including any false or misleading oral or written statement which has the capacity, tendency, or effect of deceiving or misleading consumers (§ 13–301(1)), any representation that consumer realty has a "sponsorship" which it does not have (§ 13–301(2)), any failure to state a material fact if the failure deceives or tends to deceive (§ 13–301(3)), any false or misleading representation of fact which concerns either the reason for, existence, or amount of a price reduction or a comparison with the price offered by the seller at a past or future time (§ 13–301(6)), and any deception, misrepresentation, or omission of material fact with the intent that the consumer rely on it in connection with the promotion or sale of consumer goods, realty, or service (§ 13–301(9)).

Section 13–305 deals specifically with the offering of prizes. Subsection (b) makes it unlawful, as part of an advertising scheme, to notify a person that he has won a prize or has been selected or is eligible to receive anything of value if the person is required to purchase goods or services, pay any money, or submit to a sales promotion effort in order to claim the prize. Subsection (c) requires

that, in any prize-offering scheme not prohibited by subsection (b), the seller must disclose to the offeree, clearly and conspicuously, certain information, including a statement that the purpose of the promotion is to solicit the purchase or rental of real estate, the number of prizes in each category that will be available, the suggested or comparable retail price of the prizes, and the odds against winning each prize. These disclosures must appear on the first page of the prize notification document.

Hearings were conducted on the Division's complaint before a hearing officer. On April 2, 1990, the hearing officer filed his proposed findings of fact and conclusions of law. After citing and relying upon a great deal of the testimonial and documentary evidence presented to him, he found that, by virtue of their language and composition, the notices mailed into Maryland (1) created a false impression that the recipient had won and would receive a major prize—an expensive car, a considerable amount of cash, an expensive television set, for example—when, in fact, there was very little likelihood that such was the case, and (2) deceived the recipient as to the value of the awards. He found that that false impression induced Maryland residents to visit the OWC campsites in Pennsylvania and Virginia, which they would not otherwise have done, that many people so induced had no interest in campsites or camping and did not know that OWC's purpose in luring them there was to sell them a campsite, and that the sole purpose of their visit was to claim the prize they believed they had won. Once at the campsite, the hearing examiner found, the people were required to take a tour of the premises as part of a high-pressure sales promotion that lasted as long as nine hours and was designed to peel away their resistance and cause them to act swiftly to purchase a membership. They were not allowed to consult among themselves or with anyone else and were unlikely to review the contract documents put before them, and, when they did ultimately agree to buy a membership, the contract documents contained terms and conditions different than those orally

agreed upon. OWC, he determined, misrepresented the pricing of the memberships, the ability of customers to rescind the contract and receive a refund of their money, and their ability to transfer or assign their memberships.

Upon these findings, the hearing officer concluded that (1) both the written notices mailed to persons in Maryland and certain oral statements made by OWC personnel at the campgrounds had the capacity, tendency, or effect of deceiving or misleading consumers, and therefore constituted an unfair or deceptive trade practice under § 13–301(1); (2) the Division had failed to prove that OWC, despite the use of fictitious names in its notices, had engaged in any practice that misrepresented its sponsorship or affiliation in violation of § 13–301(2); (3) through its notices, coupled with its conduct at the campgrounds, OWC failed to disclose to consumers material facts, the nondisclosure of which tended to deceive them, in violation of § 13–301(3); (4) through representations made at the campground regarding price discounts, OWC had made false or misleading statements concerning price reductions and price comparisons, in violation of § 13–301(6); (5) by subjecting consumers to high pressure sales tactics and other conduct at the campgrounds, OWC had demonstrated an intent that consumers rely on the various misrepresentations and omissions found by the hearing officer, in violation of § 13–301(9); (6) by requiring persons to submit to a tour and other sales promotion efforts in order to claim their prize, OWC violated § 13–305(b); (7) by failing to include certain disclosures on page 1 of the notice, OWC violated § 13–305(e) and (g); and (8) to the extent that OWC's practices were unfair or deceptive and thus in violation of § 13–301, they also constituted unfair or deceptive trade practices in violation of § 13–303.

OWC filed lengthy exceptions to the hearing officer's proposed findings, conclusions, and order. It claimed that the hearing officer was biased, that many of his findings and certain provisions in his proposed order were not supported by substantial evidence, that the blanket prohibition

in the Maryland law against requiring the taking of a tour in order to receive a gift transgressed OWC's freedom of commercial speech and its right to engage in interstate commerce, that there was no evidence that any consumer purchased a campsite or suffered any damage as a result of the solicitation mailed into Maryland, and, generally, that "Maryland lacks the power to reach sales practices occurring outside her borders."

OWC's exceptions were heard by William Leibovici, Chief of the Division, who, on September 14, 1990, adopted the hearing officer's findings and conclusions, with minor amendments. Concomitantly, Mr. Leibovici overruled the specific exceptions OWC had filed to the proposed findings and conclusions and, on behalf of the Division, entered a final administrative order. The order contained a broad spectrum of both injunctive and restitutionary provisions.

The injunctive sections directed OWC to cease and desist the mailing of solicitations into Maryland unless (1) they contain certain specified disclosures in 12–point bold type on page 1 of the solicitation, (2) all Marylanders visiting a campground in response to a solicitation are immediately given their prizes and a Notice, the form of which was attached to the order, (3) Marylanders were not required to pay any money to obtain their prizes, (4) the solicitations comply with § 13–305, (5) if a prize is offered, they make clear that the solicitation is from OWC and do not indicate that a prize is being offered or a promotion is being sponsored by any other entity, (6) responding consumers either will not be asked to enter into contracts on the day of their initial visit or are given a 10–day period in which to rescind the contract, (7) if the solicitations offer a prize, they do not mislead consumers regarding the likelihood of winning any particular prize, (8) they do not represent that the retail value of the prize is greater than it is, (9) they do not create a false sense of urgency, (10) OWC does not induce responding consumers to enter into contracts by use of a sales presentation that (i) conceals or misstates the nature or terms of the contract, (ii) makes misleading price compari-

sons, (iii) misrepresents the nature and availability of discounts or the contents of contract documents, or (iv) fails to disclose all costs associated with an OWC membership prior to the consumer signing the contract, (11) OWC complies with any cancellation rights that consumers are told they have, and (12) OWC submits to the Division, in advance, a copy of any solicitation it plans to mail into Maryland along with certain information regarding any prizes it will be offering.

Apart from these injunctive provisions, the order directed OWC to cease efforts to collect payments from Maryland consumers on their membership contracts until completion of a claims procedure established in the order. Under that procedure, Marylanders who visited OWC campsites on or after June 1, 1984 in response to an OWC solicitation that violated § 13–305 and who went on a tour or listened to a sales presentation in order to obtain their prize were given the right to rescind their membership contracts and receive a full refund of all monies they had paid on the contract. Consumers who paid redemption fees in order to obtain prizes were entitled to a full refund of the amount paid and those who received redemption certificates but who had not yet paid any fee were entitled to their prize without payment of a fee. To implement this procedure, OWC was required to provide to the Division a list of all consumers who visited OWC in response to a solicitation mailed into Maryland on or after June 1, 1984 or who bought memberships after that date and separate lists of consumers who paid redemption fees or received redemption certificates. From these lists, the Division would notify the consumers of their respective rights under the order. OWC was directed to pay $30,000 toward the cost of the claims procedure and $1,000,000 into a restitution fund. If the Division was unable to collect from OWC the full amount needed to implement the restitution program, each member's refund would be reduced by $100 for each week he or she used an OWC campsite after becoming a member.

Distraught at both the administrative order and the findings and conclusions upon which it was based, OWC appealed to the Circuit Court for Baltimore City which, in a Memorandum and Order filed May 20, 1991, vacated in its entirety the Division's order. The court did not reach OWC's complaint that the Division's findings were unsupported by substantial evidence, although at one point in its Memorandum it stated that "[t]here is more than substantial evidence to support a finding that [OWC's] mailpieces are misleading." Instead, it concluded, as a matter of law, that "the Division's final order exceeds its jurisdiction." This, in turn, was based on its conclusion that the conduct the Division was seeking to regulate occurred entirely outside the State of Maryland—that the solicitations mailed into Maryland "do not cause Marylanders to purchase campground memberships," but rather the memberships are sold through high-pressure sales promotions occurring in other States. The court explained, in this regard:

> "The Division could correct any illegalities in the mailing of deceptive solicitations into Maryland without restricting Outdoor World's actions occurring solely outside this state. The Consumer Protection Division's regulation of the actions occurring in Pennsylvania, Virginia, or other states reaches too far. The nexus between the mail solicitation and the consummated sale of the campground membership is too tenuous to justify regulation as extensive as that provided for in the Division's Final Order."

The court's concern was that the administrative order "usurps the power of other states to regulate sales practices of corporations conducting business within their borders" and that it "unfairly assumes powers properly exercised by other States' legislatures." Though acknowledging that the solicitations mailed into Maryland were misleading, the court made no attempt to salvage those parts of the administrative order dealing just with those solicitations or to remand the case to the Division for a narrower order, but instead reversed the order in its entirety.

## II. *The Issues*

Although the parties have chosen to frame the issues before us in different terms, we see the appeal as initially presenting the following basic questions: If a solicitation mailed into Maryland in an effort to induce Marylanders to purchase or lease consumer goods, services, or realty would be regarded as constituting one or more unfair or deceptive trade practices, in violation of the Maryland Consumer Protection Act, had all of the conduct making the solicitation false, misleading, or deceptive occurred in Maryland, (1) is the Division precluded from regulating that solicitation because some of the conduct that makes it false, misleading, or deceptive occurs out of State, and (2) if the Division can regulate the solicitation, to what extent can it also regulate the out-of-State conduct that makes the solicitation defective? If the answer to the first part of the question is "yes," we must affirm the judgment. If the answer is "no," then we must examine with more precision the particular provisions of the administrative order to see if any of them, as written, exceed the Division's statutory or Constitutional authority.

## III. *Discussion*

As a preface to our consideration of these questions, we note that, at oral argument before us, OWC, despite its aggressive protestations below, conceded that the notices complained of by the Division were, in fact, misleading with respect to the nature of the prizes supposedly won and the likelihood that a recipient would actually receive a prize of any significant value. Apart from this concession, which clearly should have been made in the Circuit Court, if not earlier, we have examined the record made before the Division and find that it contains substantial evidence supporting the Division's conclusions that the notices mailed to Maryland residents by OWC were misleading and deceptive and that, had all of the subsequent conduct on the part of OWC occurred in Maryland, OWC would, indeed, have violated each of the statutory provisions that the Division

found were violated. As a corollary, we therefore conclude that, if all of OWC's post-solicitation conduct occurred in Maryland, i.e., if the campsites were located in Maryland and the visits, attempts to claim the offered prizes, tours, and other sales presentations all occurred in this State, the Division and the court could regulate that conduct and exercise the injunctive and restitutionary powers granted under subtitle 4 of the Consumer Protection Act (§§ 13–401—13–411).

This conclusion is a necessary predicate in resolving the broader questions of territorial reach. The extent to which the State in general, and the Division in particular, can affect conduct occurring outside the State depends, in large measure, upon the effect of that conduct on activity occurring within Maryland. The territorial or jurisdictional arguments raised by OWC, in other words, cannot be considered in a factual vacuum.

■■■■ Apart from the need for a factual predicate, the issue of the territorial reach of the Consumer Protection Act and the Division's authority to affect conduct occurring in another State needs one further refinement. OWC is correct in its assertion that, as a general rule, one State cannot regulate activity occurring in another State, and that, in deference to that principle, regulatory statutes are generally construed as not having extra-territorial effect unless a contrary legislative intent is expressly stated. *See Bigelow v. Virginia*, 421 U.S. 809, 824–25, 95 S.Ct. 2222, 2234, 44 L.Ed.2d 600 (1975); *Chairman of Board v. Waldron*, 285 Md. 175, 183–84, 401 A.2d 172 (1979). That does not mean, however, that a State cannot, through the proper regulation of activity occurring within its borders, also affect conduct occurring elsewhere. The focus must be on the nature of the conduct affected by the regulation, the nexus that such conduct has with activity occurring within the State that *is* the proper subject of regulation, and the nature and scope of the regulation. *See Attorney General of Maryland v. Dickson*, 717 F.Supp. 1090, 1101 (D.Md. 1989).

██ The Consumer Protection Act was intended to "provide minimum standards for the protection of consumers in the State." § 13–103(a). *See also* § 13–102(b). Some of those minimum standards are embodied in § 13–303, which, coupled with §§ 13–301 and 13–305, prohibit the communication to Maryland residents of false or misleading statements and inducements. If such statements or inducements are sent to Maryland residents, offensive conduct has occurred within our borders, even if the communication originated in another State. Certainly to the extent that the communication is false or misleading on its face or becomes so by virtue of further conduct occurring within Maryland, it is subject to the Maryland Act and to redress by the Division. OWC seems to concede as much. The issue of extra-territorial reach arises only when the offensive nature of the communication, or the harm arising from it, depends upon or derives from conduct occurring outside the State.

██ The conduct found offensive by the Division in this case falls into both categories. The Division concluded that the communications, on their face, created a false impression as to both the likelihood that the recipient would receive a significant prize and the value of whatever prize he or she would be awarded, and that, as a result, they had the capacity, tendency, or effect of deceiving or misleading consumers. Although the purpose of the communications was to induce the recipients to visit a campground out of State, the unfair or deceptive trade practice occurred within Maryland and was complete, at the latest, when the recipients got into their cars, in Maryland, and started their trip to the campground. The immediate harm, which occurred entirely within Maryland, was in causing them to make a trip they would not otherwise have made; that, in turn, led to the more remote, but more serious harm of luring them into the out-of-State pressure cooker. The enjoining of those kinds of deceptive communications involves no impermissible regulation of out-of-State conduct.

■ What does intrude on out-of-State conduct is the attempted preclusion of requiring responding recipients to take a tour and listen to the sales presentation. That conduct does occur entirely out of State and, at least according to OWC, it is not unlawful in the States where it occurs. The problem, here, however, is not with the statute (§ 13–305) but with the mechanism chosen by the Division for enforcing it. Section 13–305(b) does not even purport to prohibit OWC from requiring persons responding to its notices to undergo a tour or a further sales presentation or pay some sort of redemption fee in order to collect their prizes. What it prohibits is notifying Maryland residents that they have won a prize or are eligible for a prize if they will be required to face such a burden in order to obtain the prize. The regulation, in other words, is of the communication sent into Maryland, not sales promotion efforts or the redemption scheme occurring elsewhere. The communication is at least misleading, if not entirely false, because it creates an impression that the recipient has definitely won a prize of some value and is likely to win a prize of great value when, in fact, there is a condition—and indeed a somewhat onerous condition—to obtaining either one. The enjoining of this kind of communication also involves no impermissible extra-territorial reach.

■ Sections 13–403 and 13–406 authorize the Attorney General to require violators of the Consumer Protection Act to cease their violations and, upon noncompliance, to seek an injunction against continued violations. Section 13–406(c) authorizes the court to enter any order necessary to prevent a person from engaging in a prohibited practice. As the Court held in *Consumer Protection v. Consumer Pub.*, 304 Md. 731, 501 A.2d 48 (1985), the First Amendment does not prevent a State from prohibiting false or misleading commercial advertising and it does not preclude a State from requiring affirmative disclosure provisions in such advertising.

Accordingly, we conclude that the Circuit Court erred in striking the administrative order in its entirety. It clearly

is not beyond the Division's jurisdiction to enjoin OWC from continuing to send into Maryland notices that violate the Consumer Protection Act by informing recipients that they have won a prize or were eligible to win a prize if, in order to claim the prize, they will be required to submit to a sales promotion effort. Nor is it beyond the Division's jurisdiction to require that any future notices sent into Maryland disclose, in meaningful terms, what would be expected of the recipients should they attempt to claim any prizes and what the likelihood is that they will receive a prize of any significant value.

We agree with OWC that the Division has no authority, directly, to preclude sales practices that occur entirely within other States. If Pennsylvania and Virginia wish to permit the kinds of high-pressure sales techniques demonstrated in this record, that is their business. Once the consumer makes the decision to visit the campground and travels to the out-of-State location, he or she must look to the law there for protection. All that Maryland can do, in terms of future activity, is to make sure that (1) communications do not violate the specific prohibitions of the Consumer Protection Act and (2) its citizens are fairly informed by OWC of what they are likely to receive and what will be expected of them. To the extent that the order goes beyond that and purports to exercise direct control over conduct occurring entirely outside the State, it is invalid.

We turn now to the restitution provisions of the order. In *Consumer Protection v. Consumer Pub., supra,* 304 Md. at 781, 501 A.2d 48, the Court upheld the authority of the Division to fashion restitution orders, requiring sellers to make refunds to consumers who bought products after receiving notices or advertisements that violated the Consumer Protection Act, without direct proof of consumer reliance on those notices or advertisements. The Court did ban, however, the blanket direction to refund all sums collected from Maryland residents without regard to reliance. It held, in that regard, at 781, 501 A.2d 48:

"The Division may not simply require the mailing of refunds to all Maryland consumers who bought Company products during a certain period. Purchasers should be notified that they may obtain a refund; in order to be entitled to such refund, they should be required to state that they relied on the false impressions created by the advertising. In this way, purchasers who were not deceived will not receive an 'automatic' refund. It should not be necessary that each purchaser present additional evidence that he was actually deceived and relied on the misrepresentations in the advertisements. To require proof of reliance, beyond the purchaser's statement, would make recovery difficult and complicated."

█ It is evident to us from this language that, while advance proof of actual reliance is not necessary to justify a general restitution provision, actual restitution may not be ordered in the absence of some evidence that the individual purchaser was deceived by and relied upon the offending communication.

█ In this regard, there are several problems with the Division's restitution order. In *Consumer Protection,* Maryland residents were allegedly induced to purchase diet pills through the mail from an Ohio company in response to an advertisement that misrepresented the effectiveness of the pills. There was at least the prospect that some, if not all, of the consumers who purchased the pills did so in reliance on the false claims in the advertisement. The purpose of the claim procedure required by the Court was to determine, on an individual basis, which customers did rely on those statements and which did not, allowing restitution only to those who did. In contrast, the notice at issue here did not advertise campsite memberships or, itself, lead anyone to purchase a campsite membership. The maximum effect that it had was to induce consumers to visit the campground in order to collect the prizes to which they thought they were entitled. The actual inducement to purchase a membership occurred at the campground. Thus, on the record before us, there is little, if any, prospect of

any Maryland consumer honestly representing, much less proving, that he or she was induced by the prize notification to purchase a membership.

The Division seems, at least tacitly, to acknowledge this fact. Its position is that, because it was the deceptive notice that lured the consumer to the campground, the further conduct occurring there which actually led to the purchase of a membership was "in connection with" the illegal activity in Maryland, and because of that connection it had the authority to order restitution. For this, it relies on (1) § 13–204(10), authorizing the Division to assess against violators "damages which flow from the improper, incomplete or untimely restitution by the violator to the consumer of money, property, or other thing received from the consumer *in connection with* a violation of this title" and (2) § 13–402(b), dealing with the Division's duty to attempt conciliation of consumer disputes and allowing the parties to enter into an agreement providing for restitution of anything received from the consumer *"in connection with* a violation or alleged violation of this title."* (Emphasis added.)

We find no merit in that position. For one thing, § 13–402 has no application here. This dispute was not resolved through conciliation and no agreement of the type referred to in § 13–402(b) was reached. Section 13–204(10) *does* apply to this case, but it must be read in the context of the limitations previously discussed on the Division's authority to control out-of-State conduct. As we indicated, this record shows no evidence, or even the likelihood of evidence, that anyone from Maryland actually purchased a campsite membership in reliance on the offending notice. There is no basis, therefore, for a conclusion that the purchase of a membership was "in connection with" a violation of the Consumer Protection Act.

The restitution order fashioned by the Division allows any Marylander who purchased a membership on or after June 1, 1984 to rescind the contract and receive a full refund of all monies paid under it if the consumer certifies that he or

she visited a campground (1) after receiving a notice in violation of § 13–305 or (2) in response to a mail solicitation and went on a tour or listened to a sales presentation in order to obtain a prize or gift. Under the principles we have discussed above, that is far too broad and well beyond the Division's authority. It ignores entirely the requirement that there be at least a minimal showing of reliance on the offending communication which, as we have indicated, the record strongly suggests cannot be shown.

■ That is not to say that no restitution may be ordered. It appears from the record that, while only 5,000 memberships were sold to Marylanders since 1984, some 43,000 of our residents visited OWC campgrounds. There was presumably a cost to them in doing so. The record does indicate a likelihood that many, if not all, of those visits were prompted by the deceptive notices mailed to those people. We see no reason why, if it chose to do so, the Division could not, through a proper claim procedure, require OWC to refund to Marylanders who visited its campgrounds in reliance on a notice that violated the Consumer Protection Act and who did not subsequently purchase a membership an amount equal to the cost of the trip. Indeed, at oral argument before us, OWC conceded that the Division had that authority. Similarly, we see no legal deficiency in those provisions of the Division's order requiring OWC (1) to refund redemption fees charged to obtain prizes that Maryland consumers were led to believe they could obtain simply by showing up to collect them, or (2) to pay the value of prizes to those persons currently holding certificates of redemption who also were misled into thinking the prize would be given without condition upon their arrival.

It is clear that the court erred in vacating the Division's order in its entirety. Part of the relief directed by the Division was authorized by law and supported by the record. To the extent that the order was overbroad or reached conduct not subject to regulation by the Division, the court could have excised those provisions or remanded

the case to the Division for the preparation of a narrower order. That, indeed, was the approach taken in *Consumer Protection, supra*, 304 Md. at 782, 501 A.2d 48 (mandate). We shall remand the case to the Circuit Court for appropriate further proceedings.

JUDGMENT VACATED; CASE REMANDED TO CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE DIVIDED EQUALLY BETWEEN APPELLANT AND APPELLEE.