[No. D032050. Fourth Dist., Div. One. Apr. 28, 1999.]

NORWEST MORTGAGE, INC., Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
BRUCE H. CONLEY et al., Real Parties in Interest.

**COUNSEL**

Severson & Werson and Jan T. Chilton for Petitioner.

No appearance for Respondent.

Blumenthal, Ostroff & Markham, Norman B. Blumenthal, David R. Markham, Sheldon A. Ostroff, Barron E. Ramos; Chavez & Gertler and Mark A. Chavez for Real Parties in Interest.

**OPINION**

**McDONALD, J.**—Real parties in interest Bruce H. and Kathleen Conley and Kenneth and Dorine Younger (collectively plaintiffs) sued Norwest Mortgage, Inc. (Norwest Mortgage), alleging that Norwest Mortgage's "Forced Placement Insurance" (FPI) program was an unfair business practice under California's unfair competition law (UCL). (Bus. & Prof. Code[1], § 17200 et seq.) Plaintiffs allege that on lapse or cancellation of the insurance they were required to maintain as borrowers from Norwest Mortgage,

---

[1]All statutory references are to the Business and Professions Code.

Norwest Mortgage provided replacement insurance under the FPI program and charged the cost to plaintiffs. Plaintiffs allege the FPI cost charged to plaintiffs was unnecessarily expensive because it included an amount sufficient to cover rebates provided by the insurer to Norwest Mortgage.

The complaint, styled as a class action lawsuit, asserts it is brought on behalf of all borrowers throughout the United States for whom Norwest Mortgage purchased FPI during the four years prior to the lawsuit. Although the complaint originally pleaded numerous claims, plaintiffs dismissed all but the UCL claim. Plaintiffs sought nationwide class certification. Norwest Mortgage opposed nationwide class certification, arguing that the UCL does not and cannot be applied to claims of non-California residents arising out of the purchase of FPI outside of California.

The trial court granted nationwide class certification. The trial court concluded, in part, that the UCL provides a remedy to non-California residents for unfair business practices that occur entirely outside California. Norwest Mortgage's petition for a writ of mandate seeks to reverse the order granting nationwide class certification.

I

*The Facts[2]*

A. *The Parties.*

Norwest Mortgage is a mortgage company incorporated in California but with its principal place of business in Iowa. Norwest Mortgage makes and services loans secured by deeds of trusts or mortgages (the security instruments) to homeowners in all 50 states. Plaintiffs are California residents for whom FPI was purchased by Norwest Mortgage under security instruments encumbering California real estate. The members of its proposed class (the borrowers) include similarly situated California residents and non-California residents for whom FPI was purchased by Norwest Mortgage under security instruments encumbering non-California real estate.

B. *The FPI Program.*

The security instruments contain a covenant that obligates the borrowers to insure their homes against various physical hazards, including fire, and to

---

[2]Our factual background is derived from those facts that are admitted by plaintiffs' answer to Norwest Mortgage's petition for writ of mandate as supplemented by the facts developed in the proceedings for class certification.

make Norwest Mortgage an additional insured under the insurance policy. The security instruments provide that if the borrowers do not maintain the required insurance, Norwest Mortgage may purchase the FPI to protect its interests in the encumbered property and charge the borrowers for the FPI premiums.

Norwest Mortgage purchased FPI for the borrowers after the borrowers' insurance lapsed or was canceled. An estimated 27,000 class members for whom FPI was purchased reside in California; the remaining approximately 50,000 class members reside in other states.

Norwest Mortgage buys FPI from American Security Insurance Company (ASIC) through Norwest Insurance, Inc. Norwest Insurance, Inc., is an affiliate of Norwest Mortgage, is licensed as an insurance agent in California and most, but not all, of the other 49 states, and is headquartered in Minnesota. ASIC is headquartered in Georgia.

All decisions regarding Norwest Mortgage's FPI program were made by Norwest Mortgage employees at its headquarters in Iowa or at its other principal facility in Minneapolis, Minnesota. Until August 1995, Norwest Mortgage performed various tasks relating to FPI from its loan servicing centers in North Carolina, Michigan, Maryland, Illinois, Arizona and Ohio. Since August 1995 most of those functions have been "outsourced" to ASIC's hazard insurance processing center in Ohio;[3] the remaining functions are performed by Norwest Mortgage at its Iowa facility.

Since mid-1996 no functions related to the FPI program have been conducted by Norwest Mortgage in California. Between mid-1995 and mid-1996, Norwest Mortgage conducted in California some functions relating to FPI in connection with a portfolio of loans Norwest Mortgage acquired when it purchased Directors Mortgage (Directors), a small California mortgage company. After acquiring Directors in mid-1995, Norwest Mortgage operated Directors' loan servicing center in Riverside, California for an approximately 12-month period and then transferred the loan servicing functions to Norwest Mortgage's facilities in other states. Only during that 12-month period did Norwest Mortgage perform in California any

---

[3]The functions relating to the FPI performed by Norwest Mortgage from its Iowa and Minnesota facilities included receiving and reviewing insurance policies provided by borrowers, communicating with borrowers about their insurance obligations, sending warning letters when a borrower's policy was canceled or lapsed and ordering FPI if the borrower did not respond to the notices. Beginning in August 1995 most of those functions have been performed by ASIC under a contract with Norwest Mortgage for a fee to ASIC of approximately $.10 per month per loan in Norwest Mortgage's portfolio.

functions relating to FPI and then only with respect to those loans in Directors' portfolio, which represented less than 11 percent of Norwest Mortgage's nationwide portfolio of loans.

## C. *The Alleged UCL Violation.*

Under some circumstances, Norwest Insurance, Inc. collects a commission in connection with the FPI it places for Norwest Mortgage.[4] The complaint asserts that it is an unfair business practice actionable under the UCL for Norwest Mortgage to procure FPI and charge the premium to the borrowers to the extent Norwest Mortgage benefits from "cash kickbacks" in the form of commissions paid to its affiliate, Norwest Insurance, Inc.

Plaintiffs also assert that in connection with placing FPI, Norwest Mortgage committed unfair business practices actionable under the UCL because it received and benefited from "in-kind kickbacks" from ASIC. Although plaintiffs' theory of "in-kind kickbacks" is somewhat murky, they apparently contend that ASIC provides "free" services[5] to Norwest Mortgage, including tracking the borrowers' insurance coverage and sending warning letters to defaulting borrowers on Norwest Mortgage's behalf, the cost of which Norwest Mortgage would otherwise be required to fund as part of its loan servicing functions. Plaintiffs appear to contend this arrangement is an unfair business practice in violation of the UCL because ASIC charges, and Norwest Mortgage passes on to defaulting borrowers, FPI premiums that are sufficiently inflated to subsidize ASIC's services to Norwest Mortgage.

## II

### *Procedural History*

The first amended complaint alleged Norwest Mortgage could have replaced the borrowers' lapsed or canceled insurance policies at lower premiums but instead purchased FPI at inflated premiums to benefit from the cash and in-kind kickbacks offered by ASIC. The complaint alleged this conduct

---

[4]In those states in which Norwest Insurance is a licensed insurance agent and where it is permissible under state insurance regulations, Norwest Insurance collects an 11 percent commission from ASIC on FPI that Norwest Insurance placed for Norwest Mortgage.

[5]It is undisputed that Norwest Mortgage has paid ASIC for these services since August 1995, based on a fee of approximately $.10 per month per loan in Norwest Mortgage's portfolio. Although not explicit from plaintiffs' complaint or argument on appeal, we apprehend plaintiffs contend the pre-August 1995 arrangement constituted an "in-kind" kickback, and that the post-August 1995 arrangement charges a fee that is below the fair market value of the services ASIC provides and therefore only the value (rather than the fact) of the "in-kind" kickback was altered by the post-August 1995 arrangement.

was an unfair business practice in violation of the UCL and sought restitution of the excessive premiums charged to the borrowers and an injunction against Norwest Mortgage to prohibit this conduct.[6]

Plaintiffs moved for certification of the nationwide class, asserting all elements necessary to certification of the nationwide class were present: there was an ascertainable class; there were predominant common questions of law and fact; and the class representatives possessed claims typical of the class and adequately represented the class. From this predicate, plaintiffs argued the court should certify the nationwide class because Norwest Mortgage could not satisfy its burden under *Clothesrigger, Inc.* v. *GTE Corp.* (1987) 191 Cal.App.3d 605 [236 Cal.Rptr. 605] (hereafter *Clothesrigger*) of showing that (1) the laws of other interested states were in actual conflict with the UCL in a manner that would affect the outcome of the litigation, or (2) the other states had an interest in applying their laws to this dispute, or (3) the laws of other interested states rather than the UCL should be applied under the "comparative impairment" analysis. Plaintiffs also argued the choice of law provisions in the security instruments were irrelevant because the claim asserted by the lawsuit was not based on breach of contract but on violation of a statute, and a statutory claim was not governed by the choice of law provisions of the security instruments.

Norwest Mortgage opposed the motion. It argued the UCL was not intended to, and constitutionally could not, apply to the claims of non-California residents. Norwest Mortgage also asserted that even if California's statute could be applied to the claims of non-California residents, (1) the gravamen of the claim was sufficiently connected to the security instruments to require application of the choice of law provision of the security instruments, or (2) traditional choice of law principles showed there was an actual and true conflict among the laws of the various states and that each state had a paramount interest in having its law applied to the claims of its residents. Norwest Mortgage argued that in either case the court would be required to apply the laws of all 50 states, which would eliminate the

---

[6]The complaint also alleged Norwest Mortgage's conduct breached a contractual duty to the borrowers to mitigate the damages suffered by Norwest Mortgage arising from the borrowers' not maintaining the insurance, and breached the implied covenant of good faith and fair dealing owed by Norwest Mortgage to the borrowers. The complaint also contained causes of action for conversion and for imposition of a constructive trust on the funds collected by Norwest Mortgage from defaulting borrowers. These claims were dismissed before plaintiffs moved for class certification.

commonality of legal issues necessary to certification of the nationwide class.[7]

. The court granted the motion for certification of the nationwide class, reasoning that application of the UCL to the claims held by non-California residents was constitutionally permissible because Norwest Mortgage did not show the UCL was in conflict with the laws of any other state in a manner that would affect the outcome of the litigation.[8]

## III

### *Applicable Standards*

The burden is on the party seeking certification of a class to establish the existence of an ascertainable class and a well-defined community of interest among the class members. The community of interest requirement embodies a threshold showing that there are predominant common questions of law and fact applicable to the class as a whole. (*Clothesrigger, supra,* 191 Cal.App.3d at p. 612; *Richmond* v. *Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470 [174 Cal.Rptr. 515, 629 P.2d 23].) To determine if the class has the requisite community of interest, we examine the allegations of the complaint, the declarations of the attorneys (*Lazar* v. *Hertz Corp.* (1983) 143 Cal.App.3d 128, 134 [191 Cal.Rptr. 849]), and the evidence introduced at the certification hearing below. (*Caro* v. *Procter & Gamble Co.* (1993) 18 Cal.App.4th 644, 656 [22 Cal.Rptr.2d 419].) We then decide whether the trial court correctly determined the plaintiff satisfied its burden of showing that common issues of law and fact predominate over individual issues among the class members. (*Block* v. *Major League Baseball* (1998) 65 Cal.App.4th 538, 542-543 [76 Cal.Rptr.2d 567].)

Although the trial court has great discretion to grant class certification and its ruling will ordinarily be affirmed if supported by substantial evidence (*Block* v. *Major League Baseball, supra,* 65 Cal.App.4th at pp. 542-543), its ruling may be reversed if based on erroneous legal assumptions or criteria. (*Clothesrigger, supra,* 191 Cal.App.3d 605; *Richmond* v. *Dart Industries, Inc., supra,* 29 Cal.3d 462.)

---

[7]Norwest Mortgage also challenged the adequacy of the class representatives.

[8]The court also rejected Norwest Mortgage's argument that the contractual choice of law provision barred class certification, reasoning the action was not on the security instruments but was instead a claim for violation of the statute. It also reasoned that even if the action was on the security instruments, thereby triggering the contractual provision, there was no showing of a true conflict between the laws of the interested states. The court also concluded (1) ordinary choice of law principles did not preclude class certification because Norwest Mortgage did not show an actual conflict between the laws of the various states, and (2) the class representatives were adequate.

# IV

## *The Trial Court Erred by Concluding the UCL Applied to All Members of the Class*

The trial court concluded that the plaintiffs' UCL claim applied to all class members regardless of the state of their residence and regardless of the state in which Norwest Mortgage engaged in the conduct of purchasing the FPI. Based on the facts developed below, there are at least three categories of class members relevant to our analysis: California residents regardless of where the Norwest Mortgage's conduct of purchasing FPI occurred (Category I members); non-California residents for whom Norwest Mortgage's conduct of purchasing FPI occurred in California (Category II members); and non-California residents for whom Norwest Mortgage's conduct of purchasing FPI occurred in states other than California (Category III members). We conclude that, although Category I members and Category II members may assert UCL claims, the Category III members (apparently the largest class) may not assert UCL claims.[9]

### A. *The UCL Was Not Intended to Regulate Conduct Unconnected to California.*

We ordinarily presume the Legislature did not intend the statutes of this state to have force or operation beyond the boundaries of the state. (*North Alaska Salmon Co.* v. *Pillsbury* (1916) 174 Cal. 1, 4 [162 P. 93]; *People* v. *One 1953 Ford Victoria* (1957) 48 Cal.2d 595, 598-599 [311 P.2d 480].) Accordingly, we do not construe a statute as regulating occurrences outside the state unless a contrary intention is clearly expressed or reasonably can be inferred from the language or purpose of the statute. (*Diamond Multimedia Systems, Inc.* v. *Superior Court* (1999) 19 Cal.4th 1036, 1058-1059 [80 Cal.Rptr.2d 828, 968 P.2d 539] (hereafter *Diamond*).)

The UCL bans unfair business practices (§ 17200) and authorizes injunctive and restitutionary relief against "[a]ny person who engages . . . in unfair competition." (§ 17203.) However, it contains no express declaration that it was designed or intended to regulate claims of nonresidents arising from conduct occurring entirely outside of California. Plaintiffs do not cite any pertinent California authority construing the UCL as applicable to claims of non-California residents injured by conduct occurring beyond

---

[9]Because we conclude plaintiffs' UCL claim cannot form the basis for the nationwide class sought by plaintiffs, and therefore the trial court's certification order must be vacated, the remaining contentions of the parties are not ripe for adjudication until the trial court determines on remand what class, if any, should be certified.

California's borders.[10] The only relevant authority from other jurisdictions of which we are aware concluded that a state consumer protection statute analogous to the UCL does not apply to claims arising solely from extraterritorial conduct. In *Consumer Protection* v. *Outdoor World* (1992) 91 Md.App. 275 [603 A.2d 1376], the defendant was charged in a Maryland court with two forms of unfair and deceptive sales practices: sending misleading solicitations into Maryland to induce Maryland residents to travel to campgrounds outside of Maryland; and high-pressure sales tactics occurring once the consumer reached the campground in another state. Although the Maryland court upheld the injunction against sending into Maryland misleading solicitations, it struck down an injunction prohibiting activities conducted beyond the borders of Maryland. The court stated at page 1383: "We agree with OWC that [plaintiff] has no authority, directly, to preclude sales practices that occur entirely within other States. If Pennsylvania and Virginia wish to permit the kinds of high-pressure sales techniques demonstrated in this record, that is their business. Once the consumer makes the decision to visit the campground and travels to the out-of-State location, he or she must look to the law there for protection. . . . To the extent that the order . . . purports to exercise direct control over conduct occurring entirely outside the State, it is invalid." (*Consumer Protection* v. *Outdoor World, supra,* 603 A.2d at p. 1383.)

Plaintiffs' arguments that the UCL applies to Category III members are unconvincing. They first argue that because the Legislature deleted the phrase "within this state" by a 1992 amendment to section 17203 (see Stats. 1992, ch. 430, § 3, p. 1707), it intended to expand the UCL to encompass extraterritorial conduct by a defendant. However, then existing law authorized injunctive relief against unfair competition consisting of conduct occurring in other states that caused injury in California. (*People* ex rel. *Mosk* v. *National Research Co. of Cal.* (1962) 201 Cal.App.2d 765, 776-777 [20 Cal.Rptr. 516].) Because the 1992 amendment contains no legislative history suggesting it was intended to change existing law to expand California's UCL to encompass claims for injuries suffered by non-California residents caused by conduct occurring outside of California, we should not ascribe that intent to the Legislature. (*Mercy Hospital & Medical Center* v. *Farmers Ins. Group of Companies* (1997) 15 Cal.4th 213, 221-222 [61 Cal.Rptr.2d

---

[10]Plaintiffs cite *Stop Youth Addiction, Inc.* v. *Lucky Stores, Inc.* (1998) 17 Cal.4th 553 [71 Cal.Rptr.2d 731, 950 P.2d 1086] for the generic proposition that amendments to the UCL have always expanded rather than narrowed its scope, and that the 1992 amendments expanded the scope of relief to allow injunctions against out-of-state activity. (*Id.* at p. 570.) However, *Stop Youth Addiction, Inc.,* clearly involved in-state conduct injuring in-state residents, and therefore had no occasion to consider the question posed here: whether the UCL regulates out-of-state conduct causing out-of-state injury.

638, 932 P.2d 210].) Instead, we construe the 1992 amendment as declarative of existing law because it only eliminated any linguistic basis for a defendant to contend that the "within this state" limitation prohibited an injunction against out-of-state conduct.[11] The 1992 amendment did not expand the conduct regulated by the UCL. It clarified the scope of injunctive relief available to a plaintiff who was already entitled to pursue a claim under the UCL.[12]

Plaintiffs argue *Diamond, supra,* 19 Cal.4th 1036 supports the right of Category III members to prosecute in California claims under the UCL. In *Diamond,* the defendants allegedly made fraudulent statements and omissions in California that induced non-Californians to make out-of-state purchases of securities. The issue in *Diamond* was whether, when conduct violating Corporations Code section 25400 occurs in California, non-Californians who purchased stock outside California could recover under Corporations Code section 25500. The court construed the statutory scheme as permitting recovery by the injured non-California residents. The *Diamond* court rejected the defendants' argument against extraterritorial application of domestic statutes and noted that "[t]he presumption against extraterritoriality is one against an intent to encompass *conduct* occurring in a foreign jurisdiction in the prohibitions and remedies of a domestic statute. [Citations.]" (*Diamond, supra,* 19 Cal.4th at p. 1059, fn. 20, original italics.) *Diamond* concluded that cases like *North Alaska Salmon Co.* v. *Pillsbury, supra,* 174 Cal. 1 were distinguishable because "unlike the injury in [*North Alaska*], the conduct which gives rise to liability under section 25400 occurs in California." (*Diamond, supra,* at p. 1059.) The *Diamond* court emphasized there was no constitutional impediment to permitting non-Californians a right of action under the domestic statute because California has a "clear and substantial interest in preventing fraudulent practices *in this state* . . . [and] a legitimate and compelling interest in preserving a business climate free of fraud and deceptive practices," and for that reason has a legitimate interest in "extending state-created remedies to out-of-state parties harmed by wrongful *conduct occurring in* California." (*Id.* at pp. 1063-1064, italics added.)

The linchpin of *Diamond*'s analysis is that state statutory remedies may be invoked by out-of-state parties when they are harmed by wrongful conduct

---

[11]One commentator has placed a similar construction on the intent of the 1992 amendment. (See Stern, Consumer/Investor Remedies Using Bus. & Prof. Code § 17200 (The Rutter Group 1996) p. 13.)

[12]Our construction of section 17203 is in harmony with *Consumer Protection* v. *Outdoor World, supra,* 603 A.2d 1376, which concluded that out-of-state conduct causing injury within the state could be enjoined, but that the statute did not regulate out-of-state conduct causing out-of-state injury.

occurring in California. However, the facts developed below show the claims of Category III members are for injuries suffered by non-California residents, caused by conduct occurring outside of California's borders, by defendants whose headquarters and principal places of operations are outside of California. *Diamond* does not support plaintiffs' effort to include Category III members in the nationwide class seeking recovery under the UCL.[13]

B. *Due Process Precludes Application of the UCL to the Claims Held by Category III Members.*

█ Our conclusion that the UCL is inapplicable to the claims of Category III members is buttressed by the maxim of statutory construction that, where possible, we construe a statute in favor of its constitutionality. (*Welton v. City of Los Angeles* (1976) 18 Cal.3d 497, 505 [134 Cal.Rptr. 668, 556 P.2d 1119].) █ Plaintiffs argue that because California has in personam jurisdiction over Norwest Mortgage, the UCL should be interpreted to encompass injuries to non-California residents caused by Norwest Mortgage's conduct occurring outside of California. This argument raises significant due process problems under *Phillips Petroleum Co.* v. *Shutts* (1985) 472 U.S. 797 [105 S.Ct. 2965, 86 L.Ed.2d 628] (hereafter *Shutts*).[14]

█ This court in *Clothesrigger, supra,* 191 Cal.App.3d 605, recognized that under *Shutts* there are constitutional limitations on the forum state's application of its law to the claims of nonresident plaintiffs in a nationwide class action: "To apply its law constitutionally to the claims of nonresident class members, the forum state must have a ' "significant contact or [significant] aggregation of contacts" to the claims asserted by *each member* of the

---

[13]*Diamond* supports inclusion of Category II members as claimants entitled to state a UCL claim. Although they may be non-California residents, the injury arose from offending conduct occurring in California. The FPI was purchased as part of the loan servicing functions performed at Directors' loan servicing center in California. Whether this category of claimants can properly be included within a class requires an evaluation under traditional choice of law principles whether to apply California law or the laws of their respective home states. As to Category II members, there exists the potential for an actual and true conflict among possibly applicable laws. However, the parties have not litigated and the trial court has not decided whether the UCL rather than foreign laws may govern the claims of Category II members, and we therefore express no opinion on the proper disposition of this issue.

[14]Plaintiffs argue we should not consider the *Shutts* due process claim because Norwest Mortgage abandoned the argument by not raising it below in opposition to the motion for class certification. Norwest Mortgage moved for an order denying class certification and specifically argued exporting California law to nonresidents' claims would violate due process under *Shutts*. Although the court took Norwest Mortgage's motion off calendar for procedural reasons, it stated that the points and authorities filed by Norwest Mortgage, which encompassed the Shutts contention, would be considered as additional opposition to the motion for class certification. The *Shutts* argument is fully preserved.

plaintiff class, contacts "creating state interests[,"] in order to ensure that the choice of [forum] law is not arbitrary or unfair.' [Citation.]" (*Clothesrigger, supra,* 191 Cal.App.3d at pp. 612-613, quoting *Shutts, supra,* 472 U.S. at pp. 821-822 [105 S.Ct. at p. 2979], italics added.)

 We reiterate that the UCL claims of Category III members involve injuries suffered by non-California residents, caused by conduct occurring outside of California's borders by actors headquartered and operating outside of California. Norwest Mortgage argues that applying California law to these claims would be unconstitutional under *Shutts.* Plaintiffs argue applying California law would be constitutional because California has a constitutionally sufficient aggregation of contacts with these claims: Norwest Mortgage is incorporated and does business in California.

The fact that Norwest Mortgage is incorporated and does business in California gives California personal jurisdiction over Norwest Mortgage. However, *Shutts* specifically admonished that the existence of personal jurisdiction over the defendant does not alone permit application of the forum law to the claims of nonresident plaintiffs. The *Shutts* court stated at page 821 [105 S.Ct. at page 2979]: "We think that this is something of a 'bootstrap' argument. The Kansas class-action statute, like those of most other jurisdictions, requires that there be 'common issues of law or fact.' But while a State may, for the reasons we have previously stated, assume jurisdiction over the claims of plaintiffs whose principal contacts are with other States, it may not use this assumption of jurisdiction as an added weight in the scale when considering the permissible constitutional limits on choice of substantive law. It may not take a transaction with little or no relationship to the forum and apply the law of the forum in order to satisfy the procedural requirement that there be a 'common question of law.' The issue of personal jurisdiction over plaintiffs in a class action is entirely distinct from the question of the constitutional limitations on choice of law; the latter calculus is not altered by the fact that it may be more difficult or more burdensome to comply with the constitutional limitations because of the large number of transactions which the State proposes to adjudicate and which have little connection with the forum." (*Shutts, supra,* 472 U.S. at p. 821 [105 S.Ct. at p. 2979].)

*Shutts* concluded that, although the forum may have personal jurisdiction over the defendant, the forum still must have significant contact or a significant aggregation of contacts to the claims asserted by each member of the plaintiff class to ensure that application of the forum law to each plaintiff's claim is not arbitrary or unfair. (*Shutts, supra,* 472 U.S. at pp. 821-822 [105 S.Ct. at p. 2979].)

The *Clothesrigger* court, applying the *Shutts* test, concluded application of California law was constitutionally permissible there because the defendant's principal offices were in California and because the claims asserted by every nationwide class member related to the alleged fraudulent misrepresentations contained in literature prepared in California; thus the conduct occurred in California. (*Clothesrigger, supra,* 191 Cal.App.3d at p. 613; see also *Diamond, supra,* 19 Cal.4th at p. 1064 [*Clothesrigger* upheld application of California law "to out-of-state parties harmed by wrongful conduct occurring in California"].)

In contrast to the claims of class members in *Clothesrigger* and *Diamond,* the only contact between the claims of Category III members and California is Norwest Mortgage's state of incorporation.[15] Because Norwest Mortgage's headquarters and principal place of business, the place Category III members were injured, and the place the injury-producing conduct occurred are outside California, we conclude application of the UCL to the claims of Class III members would be arbitrary and unfair and transgress due process limitations.[16]

C. *The Inapplicability of the UCL to Claims of Category III Members Makes Moot Norwest Mortgage's Alleged Failure to Satisfy Its Clothesrigger Burden.*

Plaintiffs, relying on the analysis of *Clothesrigger, supra,* 191 Cal.App.3d 605 and *Hurtado* v. *Superior Court* (1974) 11 Cal.3d 574 [114 Cal.Rptr. 106,

---

[15]We are unpersuaded that the other "contacts" cited by plaintiffs permit application of California law to Category III members. Plaintiffs note Norwest Mortgage has a substantial number of loans in California, operated Directors' servicing center for a brief time, and (allegedly) owns property in California (although this latter "fact" is unsupported by any citation to the record.) (See *Davis* v. *Thayer* (1980) 113 Cal.App.3d 892, 912 [170 Cal.Rptr. 328] [court disregards factual assertions unsupported by record].) However, similar contacts in *Shutts* were found insufficient to allow application of Kansas law to non-Kansas members of the proposed class. (*Shutts, supra,* 472 U.S. at pp. 819, 822-823 [105 S.Ct. at pp. 2978, 2979-2980] [defendant's ownership of Kansas property and substantial business dealings in Kansas do not permit application of Kansas law to non-Kansas class members].)

[16]Our conclusion that application of California law would offend due process limitations is further supported by *Shutts*'s observation that "[w]hen considering fairness in this context, an important element is the expectation of the parties. [Citation.] There is no indication that when the leases involving land and royalty owners outside of Kansas were executed, the parties had any idea that Kansas law would control." (*Shutts, supra,* 472 U.S. at p. 822 [105 S.Ct. at pp. 2979-2980].) Here, there is no basis to conclude any non-Californian expected California law would govern his claim; instead, the contractual relationship between Norwest Mortgage and the borrowers specified the law of place of the encumbered property would govern. We consider the contractual choice of law provision relevant not because the current action is an action on the security instruments, but because it reinforces our conclusion that the parties in other states had no expectation that California law would govern their disputes with Norwest Mortgage.

522 P.2d 666], cite a series of cases for the proposition that unless Norwest Mortgage carries the burden of demonstrating an actual conflict between the laws of the foreign states and California law, as well as a true conflict between the laws of interested jurisdictions, California will apply its laws to the claims held by nonresident class members. From this predicate, plaintiffs argue that because Norwest Mortgage did not carry its burden to show that the laws of any other jurisdiction authorized lenders to charge excessive premiums and receive kickbacks, the trial court properly concluded the UCL applied to the claims of the Category III class members. However, in every case relied on by plaintiffs, the choice of law issues arose, and the *Clothesrigger* burden was triggered, because there were two interested jurisdictions whose laws could apply to the dispute and it was therefore necessary to make the choice of law determination.[17] However, when California law cannot be applied to the claims held by nonresident members of the nationwide class, there is no occasion for applying the choice of law rules to decide whether California's or another jurisdiction's law should govern. (*Clothesrigger, supra*, at p. 619 [only if "application of California law would be constitutional [will] the court . . . determine whether California law will likely apply under California choice of law rules"]; *Osborne* v. *Subaru of America, Inc.* (1988) 198 Cal.App.3d 646, 654-655 [243 Cal.Rptr. 815]; *Anderson* v. *Savin Corp.* (1988) 206 Cal.App.3d 356, 362 [254 Cal.Rptr. 627] [only where both states have interest in applying own laws do choice of law questions arise].) Because there was no choice of law issue to be evaluated with respect to the claims of Category III members, the choice of law rules, including Norwest Mortgage's burden to show the laws of a different jurisdiction conflicted with California law, never became relevant.

---

[17]As previously discussed, California law was potentially applicable to the claims in *Diamond* and *Clothesrigger* because the injury-producing conduct occurred in California. Similar reasons justified potential application of California law to the claims in the other cases cited by plaintiff. (*Hurtado* v. *Superior Court, supra*, 11 Cal.3d at p. 578 [injury-producing conduct and injury in California]; *North American Asbestos Corp.* v. *Superior Court* (1986) 180 Cal.App.3d 902, 906 [225 Cal.Rptr. 877] [injury in California]; *Bernhard* v. *Harrah's Club* (1976) 16 Cal.3d 313, 317-318 [128 Cal.Rptr. 215, 546 P.2d 719] [same]; *Application Group, Inc.* v. *Hunter Group, Inc.* (1998) 61 Cal.App.4th 881, 894-905 [72 Cal.Rptr.2d 73] [California law applied to decide enforceability of covenant not to compete that operated to bar California businesses from hiring for employment in California]; *Robert McMullan & Son, Inc.* v. *United States Fid. & Guar. Co.* (1980) 103 Cal.App.3d 198, 200-201 [162 Cal.Rptr. 720] [California law applied to insurance contract purchased, issued and delivered in California to California resident]; *Shields* v. *Singleton* (1993) 15 Cal.App.4th 1611, 1621 [19 Cal.Rptr.2d 459] [California law applied to shareholder derivative lawsuit on behalf of company whose headquarters and substantially of its business were within California]; *Sommer* v. *Gabor* (1995) 40 Cal.App.4th 1455, 1461-1462 [48 Cal.Rptr.2d 235] [California law applied to California resident injured by defamation published in California and elsewhere]; *In re Title U.S.A. Ins. Corp.* (1995) 36 Cal.App.4th 363, 372 [42 Cal.Rptr.2d 498] [California law applied to liquidation proceeding of insurer with offices in California].) None of these cases applied California law to a claim having no nexus with California.

## V

### *Conclusion*

Our conclusion that the UCL is inapplicable to the claims held by Category III members requires reversal of the order certifying a nationwide class asserting a UCL claim. If on remand plaintiffs seek certification of a class to include Category II members, the court must analyze the choice of law issues anew to determine whether California law or the laws of other states should govern the claims of Category II members. If the court determines the laws of other states will control some or all of the claims of Category II members, the court must also undertake the analysis described by *Canon U.S.A., Inc.* v. *Superior Court* (1998) 68 Cal.App.4th 1 [79 Cal.Rptr.2d 897] to decide whether to certify the class, considering the manageability and other issues created by subclassifications, and whether the class representatives will be adequate for any subclasses necessitated by choice of law determinations.

### *Disposition*

Let a writ of mandate issue directing the superior court to vacate its September 14, 1998, order granting plaintiffs' motion to certify the class action, and to enter a new and different order denying plaintiffs' motion for certification of a nationwide class, without prejudice to any motion for certification of a different class or classes consistent with our opinion. The temporary stay is vacated. Petitioner is entitled to costs.

Benke, Acting P. J., and Haller, J., concurred.